FILED

2020 Nov-16  PM 02:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| BRISTOL SOUTHSIDE ASSOCIATION, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.:  2:18-cv-00783-JHE |
| MERIDIAN CONSTRUCTION & DEVELOPMENT, LLC, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER[1]**

Through its amended complaint, Plaintiff Bristol Southside Association, Inc. ("BSA") asserts several claims against Defendant Meridian Construction & Development, LLC ("Meridian") related to the construction of a condominium development.  (Doc. 31).  Meridian has now moved for summary judgment on each of those claims, contending they are all barred by Alabama's construction statute of repose.  (Doc. 38).  That motion is fully briefed, (docs. 38-1, 51 & 52), and ripe for review.  For the reasons stated below, Meridian's motion is **DENIED**.

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56 "mandates the entry of summary judgment, after adequate

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 23.)

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial."  *Id.* at 324.  (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

In early 2004, Bristol GP retained Meridian as the general contractor for Bristol Southside, a planned 170-unit condominium development.[2]  (Doc. 31 at ¶¶ 10-11; doc. 52-1).  Meridian has since dissolved, but at the time it was  a Georgia limited liability corporation licensed to operate as a general contractor in Alabama.  (Doc. 31 at ¶ 3).  David C. Deriso ("Deriso") was Meridian's sole member during the relevant time period.  (*Id.*).  Architecture firm Hemsley Lamkin Rachel, Inc. ("HLR") designed the development, and Robert Lamkin of HLR was the project architect. (Affidavit of Robert Lamkin (doc. 51-2, "Lamkin Aff.") at ¶ 3).  Meridian retained a number of subcontractors to assist with the project.  (*Id.* at ¶¶ 3, 11; Affidavit of David C. Deriso (doc. 38-2, "Deriso Aff.") at ¶ 5).  Meridian's primary responsibility was to manage subcontractors, manage the construction schedule, meet with the architect, and meet with the owner's representatives. (Deposition of David C. Deriso (doc. 51-3, "Deriso Dep.") at 14).

Construction began sometime in 2004 and was completed in approximately October 2006. (Doc. 31 at ¶ 12; Deriso Aff. At ¶ 4).  Construction at the development site was supervised by Meridian employees Lonnie Roberts ("Roberts," superintendent), Leonard Ziggler ("Ziggler," assistant superintendent), Patrick Ward, ("Ward," project manager), Bill Cushard, ("Cushard," general superintendent"), and Chris Thompson ("Thompson," assistant project manager).  (Deriso Dep. at 15-16).  Roberts and Ziggler were on site every day.  (Deriso Dep. at 15).  Deriso made weekly or bi-weekly visits to the site, depending on the phase of the project.  (*Id.* at 20-21).

---

[2] Per the contract for the construction of Bristol Southside, Bristol GP owns Bristol Southside.  (Doc. 52-1).  BSA maintains and operates Bristol Southside and has the authority to sue on behalf of the owners.  (Doc. 31 at ¶ 14).

HLR also visited the site on a regular basis and inspected the work performed by Meridian. (*See* Lamkin Aff. and attachments).  After each inspection, HLR drafted a Field Report describing discrepancies between the plans and the work performed, including defects and deficiencies to be corrected.  (*See id.*).  HLR distributed copies of the Field Reports via email to necessary parties, including to Meridian employees.  (*See, e.g., id.* at 101, 106-07).  HLR also met with Meridian's representatives to discuss construction issues and obtained their feedback on ways to correct the issues.  (*See, e.g., id.* at 100).  Scott Black, the owner's representative for Bristol GP during the construction project, also met with HLR and either received Field Reports or attended construction meetings regarding all issues identified.  (Deriso Dep. at  16-17; Lamkin Aff. at 3, 5, 9, 11, 23, 27, 31, 36, 39, 48, 58, 65, 68, 74, 76, 82, 85, 93, 95, 99, 102, 106).

As constructed, the Bristol Southside condominiums are comprised of two separate buildings.  (Doc. 31 at ¶ 13).  Both buildings are wood-framed, with an exterior cladding that is "a combination of composite trim, fiber cement siding, brick veneer and three coat stucco --3/8-inch thick scratch coat, 3/8-inch thick brown coat and approximately 1/8-inch thick finish coat."  (*Id.*).

In 2017, the breezeways which provide access to the doors to each unit began to collapse.  (Doc. 31 at ¶ 15).  BSA investigated and determined that, among other things, water had flowed behind the exterior claddings, the fiber cement had not been applied correctly, and the stucco was not installed consistent with ASTM standards.[3]  (*Id.* at ¶ 16).  Additionally, load bearing columns were misaligned, causing them to fail and damage the framing.  (*Id.* at ¶ 17).

---

[3] "ASTM" refers to the American Society for Testing and Materials, a developer and publisher of technical standards.  ASTM International, https://www.astm.org (last accessed November 5, 2020).

BSA retained Licensed Home Inspector Richard Laframboise ("Laframboise"), of E-Services, Inc., to inspect both Bristol Southside buildings.  (Doc. 51 at 8; Affidavit of Richard Laframboise (doc. 51-1, "Laframboise Aff.") at ¶ 1).   Laframboise visited the buildings on multiple occasions in 2018 and again in 2020.  (Laframboise Aff. at ¶¶ 3, 6).   He observed numerous discrepancies between the work the Field Reports stated had been performed and the actual condition of the buildings.  (Laframboise Aff. at ¶¶ 7-12).   Specifically, Laframboise pointed to the following facts:

- Field Report 5 indicated as a "continuing construction issue" on January 18, 2006: "Waterproofing: We are still waiting for REVISED Water proofing details addressing our specific deck, balcony and breezeway conditions. . . . Further, we need clarification on the Tammscoat Coating as far as what level we need to do (i.e. number of coats, lusterseal sealer on top, etc.).  (Doc. 51-2 at 26).  Roberts, Zigger, Ward, Cushman, and Thompson were present for Meridian at the meeting to discuss this report.  (*Id.* at 25). This condition was listed as resolved in Field Report 9 on May 23, 2006, with the notation "Waterproofing submittals have been received, with the exception of window flashing."  (*Id.* at 56).  Bob Miller, "JD," and John Pierce were present for Meridian at this meeting.  (*Id.* at 54).  Laframboise found: "My inspection of the as-built structure determined that no Tammscoat Coating, or any other sealant, was ever applied to the affected areas."  (Laframboise Aff. at ¶ 8.a.i.).

- Field Report 6, dated February 16, 2006, indicated as a new issue that "Thru wall flashing at brick does not meet specifications. Per specification 7600/2.01/B, the thru-wall flashing is to be 'Vycor Plus Self Adhered Flashing'. The flashing being utilized

is not self-adhered." (Doc. 51-2 at 30).  Roberts and Ziggler were present for Meridian at this meeting.  (*Id.* at 29).  This issue was listed as resolved in Field Report 7 on March 16, 2006, with the notation: "Grace 40mil Perm-A-Barrier is being installed. Top of 40 mil must be behind building paper."  (*Id.* at 38).  Deriso and Ziggler were present for this meeting.  (*Id.* at 36).  However, Laframboise found that "My inspection of the as-built structure indicates this was not properly done. The very limited amount of flashing I observed was not self-adhering, or properly installed, as required by the building plans." (Laframboise Aff. at ¶ 9.a.i.).

- Also in Field Report 6, the report noted: "At brick, rope wicks are being installed instead of weep holes.  This is not acceptable.  Clean out mortar at brick ledge and create weep holes per 17/A-D1.2."  (Doc. 51-2 at 30).  This issue persisted until Field Report 10 on July 19, 2006 (Miller, Cushard, Ward, and Thompson present for Meridian).  (*Id.* at 65-67).  The parties eventually settled on a plan where "full head weeps will be installed at locations not yet bricked; at installed brick locations, Meridian has agreed to drill 3/8" weep holes where required."  (*Id.*).  Field Report 10 indicates this was resolved with the notation: "Full weeps were not installed on Bldg B. 3/8" weep holes are being drilled at the appropriate locations."  (*Id.*).  But Laframboise found: "My inspection of the as-built structure indicates the mortar was never cleaned out at the brick ledge. The photos from my April 29, 2020 inspection show the cavity behind the removed brick exterior at the brick ledge/base is filled with mortar past the second course of brick. [See Ex. A-4.] This is not a condition that can arise over time; the only time wet mortar can get behind brick and solidify is while the

bricks are being laid during construction. The fact it is still there indicates the builder never cleaned the mortar from the cavity, as instructed by the Field Reports." (Laframboise Aff. at ¶ 9.c.i.).

- Field Report 6 further noted: "At brick, provide leave outs to clean mortar out at base; every 3rd brick. See 17/AD1.2."  (Doc. 51-2 at 30).  This issue was also resolved in Field Report 10.   The report indicates that Meridian intended to remove every third brick to clean out the mortar.  (*Id.* at 67).  After this was started, the owner inspected the brick and learned that "only the mortar behind the removed bricks was cleaned out." (*Id.*).  Per Miller, Meridian reported it had cleaned out the mortar from the base flashing; Field Report 10 indicates this was resolved, as "This is being done and should continue."  (*Id.*).  However, Laframboise found "my inspection of the as-built structure indicates the mortar was never cleaned out at the 'brick ledge,' which is synonymous with the 'base.'"  (Laframboise Aff. at ¶ 9.d.i.).

- Field Report 6 also stated: "Exterior on the 20th Street side are missing the z-flashing at door heads. Install Z-flashing as required. See detail per finish condition."  (Doc. 51-2 at 30).  This was allegedly resolved in Field Report 9, with the notation "This has been done at all viewed locations."  (*Id.* at 57).  Laframboise found that this had not been done, as there was no flashing above any doors.  (Laframboise Aff. at ¶ 9.e.i.)

- Field Report 8 (Roberts and Ziggler present for Meridian) noted: "Expandable brick ties (2-piece) were not provided where brick is greater than 30' above the foundation per details 9 & 10/AD1.1. Provide a gap between the top brick course and the foam stucco trim; install a 1" backer rod and sealant."  (Doc. 51-2 at 44).  This persisted until

resolved in Field Report 10, when "per Meridian, a gap with 1" backer rod and sealant will be installed." (*Id.* at 67). Laframboise indicated "this corrective work was never performed; there is no gap between the top brick course and the foam stucco trim and there is no indication of backer rod and sealant." (Laframboise Aff. at ¶ 10.a.i.).

- Field Report 8 also indicated: "Uncovered balconies require Pemko WPS thresholds; these have not been installed. Refer to drawings and see notes on Exterior Door & Threshold submittal. Remove existing thresholds and install specified product." (Doc. 51-2 at 45). This was also resolved in Field Report 10, with the notation: "All thresholds are installed. Per Meridian, the Pemko WPS will not be installed at any doors. Meridian has accepted responsibility for waterproofing thresholds at all uncovered balconies." (*Id.* at 68). Laframboise found there were "no thresholds of any kind underneath the doors accessing balconies," which had "led to significant water infiltration and damage." (Laframboise Aff. at ¶ 10.b.i).

- Field Report 11 (Thompson, Miller, and Ward present for Meridian) showed: "The metal flashing at balcony flashing at radius (and some rectilinear) balconies is in line with or behind the stucco trim. Owners recommendations include: a. Tear-out and re-install. b. Counterflash and caulk top and bottom. c. Contractor to submit recommendation for approval." (Doc. 51-2 at 75). This was ultimately resolved in Field Report 16 (Cushard, Thompson, and David Tolbert present for Meridian), which noted that Meridian had selection option b. (*Id.* at 106). Per that report: "Where observed, flashing at walkways and balconies appears to be corrected. Per Meridian, all locations have proper flashing." (*Id.*). However, Laframboise's inspection

indicated this work was never performed, and he found "no counterflashing or caulk is present on the affected areas."  (Laframboise Aff. at ¶ 11.a.i.).

- Finally, Field Report 15 (Thompson, Miller, Ward, and Cushard present for Meridian) indicated that "At all bridges between buildings A & B, verify that bridge-building connections are properly flashed and finished. Where noted, the flashing/waterproofing had not been installed."  (Doc. 51-2 at 100).  As of Field Report 16, this was listed as resolved, with the notation "This has been done."  (*Id.* at 106).  Laframboise indicated that this had never been performed.  (Laframboise Aff. at ¶ 12.a.i.).  Instead, he found that "the bridge-building connections were not properly flashed and finished; instead, the affected areas were merely concealed with a layer of stucco."  (*Id.*).

Regarding these construction issues, Deriso testified:

> There were issues along in the way of construction, which there typically are. But at the end, it indicated all – all issues were resolved to their satisfaction and the owner's satisfaction. They were there every month, and we were paid our final draws. And there were no issues even for the past 12 years. They – everyone had my number, and I could have gone back any time to look at any issue should they come up, but nobody ever called me with any maintenance or warranty issues whatsoever, not even once, on this project.

(Deriso Dep. at 84-85).

## III. Analysis

In its amended complaint, BSA raises seven claims: Count I, for negligent or wanton construction, (doc. 31 at ¶¶ 20-25); Count II, for negligence or wantonness in general, (*id.* at ¶¶ 26-31); Count III, for negligent or wanton hiring, supervising, or training, (*id.* at ¶¶ 32-37); Count IV, a third-party beneficiary claim, (*id.* at ¶¶ 38-42); Count V, a claim for breach of warranties, (*id.* at ¶¶ 43-46); Count VI, for suppression of material facts, (*id.* at ¶¶ 47-52); and Count VII, for tolling

of the statute of limitations, (*id.* at ¶¶ 55-56).

With the exception of Count VII, which is not a cause of action in its own right, these claims seek to hold Meridian liable under different legal theories for its alleged failures in the construction of the Bristol Southside development.   Under Alabama law, when raised against certain parties, such claims are subject to a two-year statute of limitations and a seven-year statute of repose:

> All civil actions in tort, contract, or otherwise against any architect or engineer performing or furnishing the design, planning, specifications, testing, supervision, administration, or observation of any construction of any improvement on or to real property, or against builders who constructed, or performed or managed the construction of, an improvement on or to real property designed by and constructed under the supervision, administration, or observation of an architect or engineer, or designed by and constructed in accordance with the plans and specifications prepared by an architect or engineer, for the recovery of damages for:
>
> > (i)  Any defect or deficiency in the design, planning, specifications, testing, supervision, administration, or observation of the construction of any such improvement, or any defect or deficiency in the construction of any such improvement;  or
> >
> > (ii)  Damage to real or personal property caused by any such defect or deficiency;  or
> >
> > (iii)  Injury to or wrongful death of a person caused by any such defect or deficiency;
>
> shall be commenced within two years next after a cause of action accrues or arises, and not thereafter.   Notwithstanding the foregoing, no relief can be granted on any cause of action which accrues or would have accrued more than seven years after the substantial completion of construction of the improvement on or to the real property, and any right of action which accrues or would have accrued more than seven years thereafter is barred, except where prior to the expiration of such seven-year period, the architect, engineer, or builder had actual knowledge that such defect or deficiency exists and failed to disclose such defect or deficiency to the person with whom the architect, engineer, or builder contracted to perform such service.

ALA. CODE § 6-5-221.  The effect of applying a statute of repose is to create "an absolute temporal bar on a defendant's liability."  *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014).

Meridian bases its motion for summary judgment solely on the application of the statute of repose, arguing it is a "builder" under the statute.  (Doc. 38-1 at 5-6).  It puts the date on which BSA's cause of action accrued at "sometime in 2017," which makes it "anywhere from ten to eleven years after construction was completed*." (Id.* at 6).  On this basis, Meridian asserts the statute of repose bars BSA's claims.  (*Id.*).  BSA does not dispute that Meridian qualifies as a "builder" within the meaning of the statute, and thus that the statute facially applies to it.  (*See generally* doc. 51).  Instead, BSA argues that neither the statute of limitation or the statute of repose apply because Meridian had actual knowledge of defects leading to the damage and failed to disclose them.  (*See id.* at 12-21).

Here, there is sufficient evidence for a jury to find that Meridian had actual knowledge of defects and misrepresented to BSA that those defects had been corrected.  Specifically, there are some significant discrepancies between what Meridian says it did and what BSA's expert concluded were the conditions on the ground at the time of his inspection.  Taking one example (which, in this case, is sufficient for BSA to survive summary judgment), Field Report 11, dated July 26, 2006, notes as a new construction issue: "The metal flashing at balcony flashing at radius (and some rectilinear) balconies is in line with or behind the stucco trim. Owners recommendations include: a. Tear-out and re-install. b. Counterflash and caulk top and bottom. c. Contractor to submit recommendation for approval."  (Doc. 51-2 at 75).  Field Report 16, dated January 23, 2007, indicates that Meridian had selected option b. and that the issue had been resolved, noting: "Where observed, flashing at walkways and balconies appears to be corrected. Per Meridian, all

11

locations have proper flashing." (*Id.* at 106).   However, Laframboise determined that "this corrective work was never performed" and that his "inspection indicated that no counterflashing or caulk is present on the affected areas." (Laframboise Aff. at ¶ 11.a.i.).  The evidence supports that three Meridian representatives attended every meeting involving this defect, including the January 5, 2007 meeting at which Field Report 16 was discussed.  (*See* doc. 51-2 at 104).  A reasonable jury could conclude from this evidence that Meridian had actual knowledge of the issue based on its representatives' presence at the meeting.  This is not the "tenuous chain of inferences" Meridian says would be required to support its actual knowledge because it is based on nonconjectural record facts and expert opinion.

As to whether the issue was resolved to the satisfaction of Bristol GP (which also goes to whether it was a "defect" at all), the evidence also shows that (1) Meridian reported to BSA on the date of the Field Report 16 meeting that all locations had proper flashing, (*id.* at 106) and (2) Laframboise later found, on inspection, that no counterflashing or caulk was present, (doc. 51-1 at 6).[4]  Although Meridian points to the fact that the Field Reports indicate Bristol GP explicitly approved of *some* remedial work it performed, (*see* doc. 52 at 3-4, 10-11), that is not the case for the incident above, which shows Bristol GP relied on Meridian's word that the work had been

---

[4] Meridian casts the presence of this (and other) defects at all as a problem requiring the jury to speculate what happened over the years, since BSA does not offer anything that goes to "whether any maintenance, repair or other construction work of any kind was performed on the condominium buildings during those twelve years." (Doc. 52 at 6-7).  That oversells how great a logical leap the jury would be required to make; after all, they have Laframboise's opinion— explicitly stating his opinion that the work was not done—on which to rely.  And Meridian simply offers its own speculative alternatives to Laframboise's opinion rather than seeking to undermine it on evidentiary grounds.

performed.    Based on Laframboise's opinion that no counterflashing or caulk had ever been installed, a reasonable jury could conclude that Meridian representatives misrepresented to Bristol GP at the meeting that the work had been done (or, in the words of the statute, "failed to disclose" to Bristol GP that the defect still existed).   A reasonable jury could then conclude that other repairs supposedly made by Meridian had in fact not been made, which is simply a matter of extrapolating this inference to other work Meridian says it performed—in other words, assessing the credibility of Meridian's assurances it did the work.    Meridian argues that other inferences could conceivably be drawn from this information—i.e., that "repairs were made in good faith by Meridian and its subcontractors, but that unbeknownst to Meridian the repairs did not successfully resolve the issues" or that "the subcontractors reported to Meridian that they had performed the remedial work when they had not, and Meridian unwittingly passed this incorrect information on"—but this overstates BSA's burden at summary judgment and understates the court's responsibility to draw reasonable inferences in BSA's favor.  To that end, it is immaterial that Deriso denied there were any unresolved construction issues, (*see* Deriso Dep. at 84-85), because the most this does is create a factual issue that a jury must resolve.  Accordingly, Meridian's motion for summary judgment is due to be denied.

## IV. Conclusion

For the reasons stated above, Meridian's motion for summary judgment, (doc. 38), is **DENIED**.  The parties are **DIRECTED** to confer and to submit a joint status report by **November 30, 2020** regarding new deadlines for, at a minimum, discovery and dispositive motions.

DONE this 16th day of November, 2020.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE